_____
)
**SIARHEI FILAZAPOVICH et al.,**                )
)
    **Plaintiffs,**                )
)
        **v.**                )    **Case No. 21-cv-00943 (APM)**
)
**DEPARTMENT OF STATE et al.,**                )
)
    **Defendants.**                )
_____ )


_____
)
**BRANDON KIN SHAUN GOH et al.,**                )
)
    **Plaintiffs,**                )
)
        **v.**                )    **Case No. 21-cv-00999 (APM)**
)
**U.S. DEPARTMENT OF STATE et al.,**                )
)
    **Defendants.**                )
_____ )


_____
)
**MAXWELL GOODLUCK et al.,**                )
)
    **Plaintiffs,**                )
)
        **v.**                )    **Case No. 21-cv-01530 (APM)**
)
**JOSEPH R. BIDEN, JR. et al.,**                )
)
    **Defendants.**                )
_____ )


## <u>MEMORANDUM OPINION AND ORDER</u>

## I.    INTRODUCTION

      Since the onset of the COVID-19 pandemic, the State Department has dramatically reduced

its processing of diversity visa applications.  In April 2020, President Donald Trump issued

Presidential Proclamation 10014, which prohibited diversity visa selectees from entering the United States unless they could establish that their entry was in the national interest.  The State Department, in turn, refused to consider diversity visa selectees as candidates for a national-interest exception and interpreted Proclamation 10014's ban on diversity visa holders entering the country to mean that diversity visa applicants were ineligible for visas.  This effectively halted the diversity visa program for Fiscal Year ("FY") 2020.

In the summer of 2020, thousands of FY 2020 diversity visa applicants brought suit in this court across multiple cases, seeking preliminary relief requiring the State Department to process diversity visa applications and requesting that the court reserve additional diversity visa numbers that could be issued to applicants after FY 2020 closed on September 30, 2020.  *See Gomez v. Trump* (*Gomez I*), 485 F. Supp. 3d 145 (D.D.C. 2020); *Gomez v. Trump* (*Gomez II*), 490 F. Supp. 3d 276 (D.D.C. 2020); *Gomez v. Trump* (*Gomez III*), No. 20-cv-1419 (APM), 2021 WL 3663535 (D.D.C. Aug. 17, 2021).  The court found, among other things, that while Proclamation 10014 was likely lawful, the State Department's stance that Proclamation 10014's bar on *entry* automatically foreclosed the *issuance* of FY 2020 diversity visas was likely contrary to law.  *See Gomez I*, 485 F. Supp. 3d at 190–94.  The court also certified a class consisting of FY 2020 diversity visa selectees.  *See Gomez II*, 490 F. Supp. 3d at 291–94.  In early September 2020, the court granted preliminary injunctive relief for the class, requiring the State Department to adjudicate the plaintiffs' diversity visa applications and reserve 9,095 diversity visa numbers for processing pending the matter's final disposition.  *Id.* at 294–95.

Despite the court's preliminary ruling, the State Department did not abandon its legal position.  It continued to implement as agency policy that Proclamation 10014's ban on entry legally foreclosed the State Department from issuing diversity visas.  The State Department

applied this policy to the next group of diversity visa lottery winners, those selected for FY 2021. As a result, it refused to schedule interviews at consular offices worldwide for FY 2021 diversity visa winners—a necessary procedural step to visa issuance.

This policy continued until shortly after President Joseph Biden took office.  In February 2021, the new administration lifted the restriction on scheduling FY 2021 selectees for consular interviews.  Though interviews could now proceed, they would be scheduled under a prioritization scheme the State Department adopted in November 2020 that placed diversity visas in the lowest priority tier for processing immigrant visas.  By then, the first five months of FY 2021 had passed with the State Department having issued almost no diversity visas.  Because diversity visa selectees are eligible for a visa only until the end of the fiscal year for which they are selected, that meant that only seven months remained to process and adjudicate the annual allotment of 55,000 diversity visas authorized by Congress.  The State Department publicly acknowledged in April 2021 that its issuance of FY 2021 diversity visas likely would not approach the statutory ceiling.

Pending before the court are three matters in which diversity visa applicants have sued for relief:  *Filazapovich v. Department of State*, No. 21-cv-943; *Goh v. U.S. Department of State*, No. 21-cv-999; and *Goodluck v. Biden*, No. 21-cv-1530.  The *Goh* parties have cross-moved for summary judgment, and the *Filazapovich* and *Goodluck* Plaintiffs have moved for preliminary injunctions.  Because the three cases concern nearly identical issues and became ripe for adjudication around the same time, the court held a consolidated hearing on the three matters and now resolves the motions in all three cases.

For the reasons that follow, the court denies the *Filazapovich* Plaintiffs' motion for preliminary injunction for lack of standing, grants in part and denies in part the *Goh* parties'

3

motions for summary judgment, and grants the *Goodluck* Plaintiffs' motion for preliminary injunction.

## II.     BACKGROUND

### A.     The Diversity Visa Program

Congress has provided for up to 55,000 immigrant diversity visas to be distributed each fiscal year to foreign nationals that hail from countries with historically low levels of immigration to the United States.  8 U.S.C. § 1151(e); *see also id.* § 1153(c).  Millions of hopefuls enter a lottery for the chance to apply for one of the 55,000 allotted diversity visas.  *See Gomez I*, 485 F. Supp. 3d at 159.  The winners of the lottery "submit an application and various documents to be eligible for a visa number," which can be used only during the fiscal year for which the selectee applied.  *Almaqrami v. Pompeo*, 933 F.3d 774, 776–77 (D.C. Cir. 2019).  Once the selectee is given a visa number, they submit several documents to the Kentucky Consular Center ("KCC").  *See* 9 FAM 502.6-4(d)(1).  The KCC reviews the documents and, if the documents are in order, deems the applicant "documentarily qualified" and schedules an interview for the applicant when his regional lottery rank number is about to become current.  9 FAM 502.6-4(d)(2); *see also* 8 U.S.C. § 1202(b) ("All immigrant visa applications shall be reviewed and adjudicated by a consular officer.").  Thereafter, "if he meets the criteria to obtain one, the State Department 'shall' issue him a diversity visa."  *Almaqrami*, 933 F.3d at 777 (quoting 8 U.S.C. § 1153(c)).

### B.     Diversity Visa Processing and Adjudication During the Pandemic

#### 1.     *The Presidential Proclamations*

On April 22, 2020, President Trump issued Presidential Proclamation 10014, which, among other things, suspended the entry of diversity visa holders into the United States unless their entry was "in the national interest."  Proclamation 10014, 85 Fed. Reg. 23,441, 23,441–43

(Apr. 22, 2020).  Proclamation 10014 remained in effect for 60 days, *id.*, after which President Trump issued Presidential Proclamation 10052, which extended the entry ban on diversity visa holders through December 31, 2020.  85 Fed. Reg. 38,263, 38,263, 38,266 (June 22, 2020).  On December 31, 2020, President Trump issued a third Proclamation, Presidential Proclamation 10131, extending the bar on entry through March 31, 2021.  *See* Proclamation 10131, 86 Fed. Reg. 417, 418 (Dec. 31, 2020).

### 2.    *State Department Halts Diversity Visa Processing*

The State Department adopted relevant visa-processing policies both before and after the issuance of Proclamation 10014.  On March 20, 2020, in response to the worsening COVID-19 pandemic, the Secretary of State directed all diplomatic and consular posts "to immediately suspend all routine nonimmigrant and immigrant visa services."  Joint Appendix, *Goh*, No. 21-cv-999, ECF No. 36, Admin. R. on DV-2021 Scheduling & Prioritization, ECF No. 36-2 [hereinafter DV-2021 CAR], at 23.[1]  Under the March 20 guidance, consular posts were restricted to providing "mission-critical and emergency visa services," which were defined to exclude processing diversity visas.  *See id.*; *see also id.* at 24 ("[National Visa Center] and KCC will suspend most immigrant/diversity visa pre-processing.").

Following the issuance of Presidential Proclamation 10014, the State Department instructed posts that they could adjudicate immigrant visas ("IVs") only for "applicants that [the] post believes may meet an exception to the PP, including the national interest exception, and that constitute a mission-critical category."  DV-2021 CAR at 29.  The Department made clear that

---

[1] The parties have provided two separate Certified Administrative Records in the Joint Appendix filed at ECF No. 36 in *Goh*, No. 21-cv-999.  The Certified Administrative Record pertaining to the State Department's Interpretation and Use of 8 U.S.C. § 1182(f) appears in the first and second volumes of the Joint Appendix at ECF Nos. 36-1 and 36-2 on the *Goh* docket.  The Certified Administrative Record pertaining to DV-2021 Scheduling & Prioritization appears in the second volume at ECF No. 36-2.  All pagination refers to the pagination for each administrative record, which is located in the top right corner of the page.

consular posts "may not issue any IVs that are not also excepted under the PP." *Id.*  The guidance

included some categories of immigrant visas that might fit the national-interest and mission-critical

criteria, but there were no apparent "specific national interest exceptions available for diversity

visa applicants." *Gomez I*, 485 F. Supp. 3d at 162; *see also* DV-2021 CAR at 29.

As the pandemic continued, the State Department eased restrictions on processing some

visa categories, but not diversity visas.  On July 8, 2020, the State Department issued updated

guidance that created "a phased approach to the resumption of routine visa services" known as the

"Diplomacy Strong framework."  DV-2021 CAR at 31–32.  The guidance laid out visa-processing

priorities across three phases of resumed services.  In Diplomacy Strong Phases Zero and One,

posts were required to "prioritize the cases that may fall under an exception to P.P. 10014" and

were permitted to "continue processing only emergency and mission-critical IV cases." *Id.* at 32.

Diversity visas were not expressly mentioned as a mission-critical immigrant visa category.  In

Diplomacy Strong Phase Two, posts were instructed "to plan two months in advance" to schedule

cases and prepare "for the resumption of routine IV services." *Id.* at 33.  Phase Two prioritized

immediate relative ("IR") cases, and posts were instructed that, "[i]deally, every documentarily

qualified IR case should be scheduled for the following month." *Id.*  Barring that, posts were

instructed to "at a minimum take steps to try to prevent their IR backlog from growing either in

absolute terms or relative to their Family Preference (FP)/Employment Preference (EP) backlog."

*Id.*  Finally, posts in Diplomacy Strong Phase Three were permitted to "resume routine services

for all IV classes and cases excepted under P.P. 10014." *Id.*  The guidance created the following

order of priority for processing applications in Phase Three:  (1) "[a]ppointments cancelled due to

the suspension of routine visa operations"; (2) "[a]doptions, age outs, humanitarian cases," special

immigrant visas, asylum beneficiary visas, and returning resident visas; (3) immediate relative and

close relative cases; (4) non-immigrant fiancé visas; and (5) family preference, employment preference, and diversity visa cases excepted from Proclamation 10014. *Id.* at 34. Posts were instructed that they should make "some appointments . . . available in each category each month to prevent complete stagnation." *Id.* In sum, the Diplomacy Strong Framework meant that only when a consular post reached Phase Three could it process diversity visas, and even then, it could process diversity visas only for selectees eligible for an exception under Proclamation 10014. *See Gomez I*, 485 F. Supp. 3d at 164.

The State Department issued new visa-processing guidance on November 12, 2020. It provided that "[a]lthough the Diplomacy Strong framework provides important context and structure, posts are no longer obligated to be in a specific Diplomacy Strong phase to adjudicate a particular visa class as described in prior guidance." DV-2021 CAR at 1. Still, the guidance defaulted to "a tiered and hierarchical approach when considering which services to resume and in what numbers" that closely resembled the Diplomacy Strong Framework. *Id.* Citing congressionally created "timelines" for "family-based IV and fiancé NIV" cases and Congress's instruction "that it should be the policy of the Department of State to process family preference cases within 60 days of the receipt of all necessary documents," the State Department required posts to prioritize immediate relative and fiancé visas "over most other IV categories." *Id.* at 1–2. The Department instructed consular posts to schedule and adjudicate "some family preference, employment preference, and diversity visa cases . . . each month, to the extent [the] post has capacity." *Id.* at 2. It also introduced an updated four-tier priority scheme for processing immigrant visas: (1) immediate relative visas for adopted children, "cases involving applicants who may age out," special immigrant visas, and "emergency cases" as determined by State Department staff; (2) immediate relative visas for spouses, visas for fiancés, and returning resident

visas; (3) additional special immigrant visas and family preference visas; and (4) "[a]ll other IVs, including Employment Preference, other [special immigrant visas], and Diversity Visas." *Id.* Diversity visa processing thus remained relegated to the lowest priority tier.

In an Action Memo accompanying the guidance, the State Department explained that the prioritization scheme "reflect[ed] the Department's policy of facilitating the unification of U.S. citizens' immediate families" and was responsive to the express timelines Congress created for processing certain immediate relative visas. *See id.* at 11. The Action Memo also noted that "[w]hile they must be given lower priority," the Department aimed to process employment preference cases and diversity visa cases and "use all available immigration numbers." *Id.* Finally, the Action Memo stated that "while post resources are severely strained, posts are directed to deprioritize categories of applicants who appear to be ineligible for visas," including applicants who were subject to "the two proclamations suspending entry of certain visa applicants who pose a threat to the labor market during the recovery (P.P. 10014 and 10052)." *Id.* at 13.

C.     **Rescission of Proclamation 10014**

The tiered prioritization framework and Proclamation 10014 remained in operation through the transition of presidential administrations. The Biden Administration, however, took early action related to the diversity visa program.

*First*, on February 19, 2021, the State Department issued guidance on "Scheduling and Prioritizing Immigrant Visas and Diversity Visa Cases." *Id.* at 47. That guidance anticipated "the upcoming expiration of Presidential Proclamation (P.P.) 10014" and instructed that "[National Visa Center], KCC, and consular sections worldwide begin scheduling IV and DV-2021 cases currently subject to P.P. 10014 for appointments starting in April 2021." *Id.* The guidance incorporated the tiered prioritization framework announced in November 2020 and emphasized

that "IV-processing posts should continue to maximize their resources to schedule as many family-based IV and fiancé NIV appointments as possible, focusing on reducing any Immediate Relative (IR) visa backlog each month, as resources allow." *Id.* Still, posts with immediate relative backlogs were instructed to "schedule some Family Preference (FP) cases, Employment Preference (EP), and Diversity Visa (DV) cases each month considering the backlog, if any, for each type of case, but allocate at least 75 percent of each month's appointments to backlogged IRs." *Id.*

*Second*, on February 24, 2021, President Biden issued Proclamation 10149. That action revoked Proclamation 10014 and section 1 of Proclamations 10052 and 10131, which had extended the entry ban on diversity visa holders. *See* Presidential Proclamation 10149, 86 Fed. Reg. 11,847, 11,847 (Feb. 24, 2021). Proclamation 10149 also instructed the Secretary of State, Secretary of Labor, and Secretary of Homeland Security to review "agency actions developed pursuant to Proclamation 10014 and, as appropriate, issue revised guidance consistent with" Proclamation 10149. *Id.*

The State Department's prioritization plan announced in November 2020 remained in effect, but it was not publicly announced until April 6, 2021. *See* Oral Arg. Tr., *Goh v. Biden*, No. 21-cv-999, ECF No. 35 [hereinafter Hr'g Tr.], at 119:10–17. When the State Department revealed the plan in April, it also articulated a rationale for the prioritization scheme. "The guiding principle on which we have based immigrant visa prioritization," the State Department explained, "is that family reunification is a clear priority of the U.S. Government's immigration policy, a priority [that] is expressed in the Immigration and Nationality Act (INA)." U.S. Dep't of State, Bureau of Consular Affs., Immigrant Visa Prioritization [hereinafter Prioritization Announcement], https://travel.state.gov/content/travel/en/News/visas-news/immigrant-visa-

9

prioritization.html (last updated Aug. 30, 2021). "[T]he Department's prioritization relied on clear direction from Congress that the Department must adopt a policy of prioritizing immediate relative visa applicants and K-1 fiancées of U.S. citizens, followed by family preference immigrant visa applicants." *Id.* The Department also specifically noted the negative impact the prioritization scheme would have on diversity visa applicants: "We . . . acknowledge that certain programs, including the diversity visa program, operate on a fiscal year basis as required by law." *Id.* It continued, "[t]he Department values the diversity visa program and is making every effort to process as many diversity visa cases as possible, consistent with other priorities, despite the severe operational constraints and backlog resulting from the COVID pandemic." *Id.* Nonetheless, the Department concluded that, "as a result of COVID the number of visas issued in lower-priority preference categories or in such programs as the diversity visa program likely will not approach the statutory ceiling in Fiscal Year 2021." *Id.*

*       *       *

To recap: For the first four-plus months of FY 2021 (October 1, 2020, to February 17, 2021), the State Department refused to schedule consular-office interviews for DV-2021 selectees because the agency held the view that Proclamation 10014's bar on entry rendered DV-2021 selectees ineligible to receive a visa. On February 17, 2021, the agency green-lighted scheduling interviews of DV-2021 selectees who were documentarily qualified, but such scheduling was subject to the four-tier prioritization scheme first adopted in November 2020. Diversity visas were grouped in the last of the four tiers of immigrant visas.

As of July 8, 2021, the State Department had adjudicated 4,305 applications of DV-2021 selectees and had issued 3,506 DV-2021 visas. *See* Notice of Lodging, Decl. of Laura Stern, *Goh*,

No. 21-cv-999, ECF No. 32, at 4.  As of July 15, 2021, the agency had scheduled and transferred to consular posts 6,018 DV-2021 cases, representing 11,557 applicants, for interviews.  *See id.*

### D.   Procedural Background

For purposes of this decision, the court has consolidated three cases, two of which were marked related to the *Gomez* matter.  The court briefly discusses each in turn.

#### 1.   Filazapovich v. Department of State *(21-cv-943)*

The *Filazapovich* matter arrived first on April 6, 2021, without a related-case designation. Compl. for Decl., Equitable, & Injunctive Relief, *Filazapovich v. Dep't of State*, No. 21-cv-943, ECF No. 1.  The *Filazapovich* Plaintiffs are "citizens, nationals, or residents of the Republic of Belarus" who have either been selected in the diversity visa lottery for FY 2021 or are derivative beneficiaries of applicants who were selected in the diversity visa lottery for FY 2021.  Pls.' Req. for Prelim. &/or Permanent Inj. & Req. for Expedited Hr'g, *Filazapovich*, No. 21-cv-943, ECF No. 9 [hereinafter *Filazapovich* Pls.' Br.], at 8.  The *Filazapovich* Plaintiffs have moved for a preliminary injunction on several of their claims, including that (1) the State Department's prioritization plan and COVID-19 guidance are ultra vires, *see id.* at 21–29; (2) the State Department's failure to process diversity visa applications as mission critical and the Department's prioritization plans are arbitrary and capricious and not in accordance with the law, *id.* at 29–34; and (3) Defendants unreasonably delayed and unlawfully withheld adjudication of Plaintiffs' diversity visa applications, *id.* at 34–37.  The *Filazapovich* Plaintiffs request an order enjoining "Defendants' 'mission-critical' guidance" and "the 'Diplomacy Strong' Framework" and an order requiring "Defendants to adjudicate promptly Plaintiffs' pending . . . applications."  *Id.* at 6.  In the alternative, they request an order requiring "Defendants to implement a rational process" for

scheduling and adjudicating Plaintiffs' applications and for the court to "reserv[e] 169 DV2021 visa numbers for the duration of this litigation." *Id.*

> 2.      Goh v. U.S. Department of State *(21-cv-999)*

The *Goh* Plaintiffs are also "selectees of the DV2021 lottery" who challenge the State Department's policies affecting the processing of their applications. *See* Am. Compl., *Goh*, No. 21-cv-999, ECF No. 17 [hereinafter *Goh* Am. Compl.], ¶ 25. They marked their case as related to *Gomez.* Notice, *Goh*, No. 21-cv-999, ECF No. 5. The *Goh* parties proceeded on an expedited schedule. Defendants moved to dismiss the Amended Complaint or, in the alternative, for summary judgment, while Plaintiffs cross-moved for summary judgment. *See* Defs.' Mot. to Dismiss, or, in the Alternative, for Summ. J., *Goh*, No. 21-cv-999, ECF No. 22, Mem. of P. & A. in Supp. of Defs.' Mot. to Dismiss, or, in the Alternative, for Summ. J., ECF No. 22-1 [hereinafter *Goh* Defs.' Br.]; Pls.' Opp'n to Defs.' Mot. to Dismiss & Cross-Mot. for Summ. J., *Goh*, No. 21-cv-999, ECF No. 23 [hereinafter *Goh* Pls.' Br.].

Plaintiffs' motion asserts that (1) Defendants' No-Visa Policy[2] is not in accordance with the law and exceeds statutory authority, *Goh* Pls.' Br. at 23–27; and (2) Defendants unreasonably delayed processing their DV-2021 applications, *id.* at 27–39. The *Goh* Plaintiffs request (1) "an order requi[r]ing the immediate scheduling of interviews for Plaintiffs who have submitted the required documentation and the expeditious issuance of visas for those who are approved at interview," (2) "an order requiring Defendants to undertake all feasible efforts to ensure that all 55,000 DV-2021 visas are processed during the fiscal year," and (3) "the reservation of any shortfall of the 55,000 allotted visas during the fiscal year." *Id.* at 39.

---

[2] As in *Gomez*, when the court refers to the "No-Visa Policy" in this opinion it means the State Department's legal position and policy that Proclamation 10014's restriction on entry, by operation of law, rendered diversity visa selectees ineligible to receive a diversity visa.

Defendants, in turn, seek summary judgment on the grounds that: (1) the claims of Plaintiffs who have had their diversity visa applications adjudicated should be dismissed as moot, *Goh* Defs.' Br. at 18; (2) the doctrine of consular nonreviewability deprives the court of jurisdiction over the Secretary of State's decision to withhold processing of diversity visas while Proclamation 10014 was in effect, *id.* at 18–21; (3) Plaintiffs lack standing to challenge the No-Visa Policy, and they lack a redressable injury that can be traced to Defendants' actions, *id.* at 22–25; (4) Plaintiffs' unreasonable delay and unlawful withholding claims should be dismissed because the Secretary of State and Department of State are improper defendants, *id.* at 25–26; (5) Plaintiffs cannot state a claim for unreasonable delay of adjudication, *id.* at 26–39; (6) Plaintiffs' mandamus claim should be dismissed because Plaintiffs have not identified a nondiscretionary duty Defendants were required to take, *id.* at 39–41; and (7) Defendants correctly interpreted the INA to require them to enact the No-Visa Policy or, at a minimum, their interpretation of the INA is owed deference, *id.* at 41–53.

   *3.*  Goodluck v. Biden *(21-cv-1530)*

The *Goodluck* Plaintiffs are over 24,000—that number is not a typographical error— DV-2021 applicants who have submitted documents for review in support of their applications. *See* Am. Compl., *Goodluck v. Biden*, No. 21-cv-1530, ECF No. 24 [hereinafter *Goodluck* Compl.], ¶¶ 1, 24–25.  They designated their case as related to *Gomez* and *Goh*.  Notice, *Goodluck*, No. 21-cv-1530, ECF No. 2.[3]  The *Goodluck* Plaintiffs have moved for a preliminary injunction.  Pls.' Mot. for Prelim. Inj., *Goodluck*, No. 21-cv-1530, ECF No. 18 [hereinafter *Goodluck* Pls.' Mot.].

---

[3] Neither *Goh* nor *Goodluck* is likely "related" to *Gomez* under this District's related-case rule.  *See* L. Civ. R. 40.5. *Goh* and *Goodluck* concern a different diversity visa fiscal year than *Gomez* and involve a challenge to at least one different policy, the November 2020 prioritization scheme.  Thus, neither case likely "involve[s] common issues of fact" or "grow[s] out of the same event or transaction" as *Gomez*.  *See* L. Civ. R. 40.5(a)(3).  Nevertheless, *Goh* and *Goodluck* are related to *Filazapovich*, and, because *Filazapovich* was randomly assigned and first filed, under the related-case rule, *Goh* and *Goodluck* would have ended up before this court.  *See* L. Civ. R. 40.5(c).  For that reason, the court did not submit *Goh* or *Goodluck* for reassignment.

They argue that they are likely to succeed on their claims that (1) the No-Visa Policy violates the Administrative Procedure Act ("APA") because it is not in accordance with law and is arbitrary and capricious, *Goodluck* Pls.' Mot., Mem. in Supp. of Pls.' Mot. for Prelim. Inj., ECF No. 18-1 [hereinafter *Goodluck* Pls.' Br.], at 27–29; (2) Defendants' tiered prioritization scheme for issuing visas is ultra vires, *id.* at 29–30; (3) Defendants' tiered approach is arbitrary and capricious, *id.* at 30–31; (4) the mission-critical requirement for visas to issue violates the APA, *id.* at 31–33; (5) Defendants unreasonably delayed and unlawfully withheld adjudication of Plaintiffs' applications, *id.* at 34–40; (6) Defendants exceeded their authority under 5 U.S.C. § 903 by "direct[ing] a phase-out of day-to-day adjudication of DVs," *Goodluck* Pls.' Br. at 40–42; (7) Plaintiffs are entitled to a writ of mandamus, *id.* at 42–43; and (8) Defendants violated the APA by not going through notice-and-comment rulemaking to establish the prioritization scheme and mission-critical requirements, *id.* at 43–44.

*     *     *

Because these three cases involve similar legal claims, the court held a consolidated oral argument on Plaintiffs' motions and the *Goh* Defendants' cross-motion. *See, e.g.*, Minute Order, *Goh*, No. 21-cv-999 (D.D.C. June 24, 2021). Following the hearing, the court ordered supplemental briefing on whether Plaintiffs have suffered a sufficiently imminent injury to confer standing. The court now resolves the merits of the three motions together.

## II.   LEGAL STANDARDS

### A.   Summary Judgment

The *Goh* parties' motions are evaluated under the familiar summary judgment standard for agency action. When courts review agency action under the APA, "summary judgment is the mechanism for deciding whether as a matter of law an agency action is supported by the

14

administrative record and is otherwise consistent with the APA standard of review." *Louisiana v. Salazar*, 170 F. Supp. 3d 75, 83 (D.D.C. 2016). The district court "sits as an appellate tribunal," reviewing the entire case as a question of law. *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083–84 (D.C. Cir. 2001) (collecting cases). Accordingly, the court need not engage in lengthy factfinding, and, as a general rule, judicial review is limited to the administrative record. *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014); *see also* 5 U.S.C. § 706 ("[T]he court shall review the whole record or those parts of it cited by a party . . . ."). After-the-fact rationalizations "advanced to remedy inadequacies in the agency's record" or in the agency's explanation will not suffice. *City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1165 (D.C. Cir. 1987).

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "This is a 'narrow' standard of review as courts defer to the agency's expertise." *Ctr. for Food Safety v. Salazar*, 898 F. Supp. 2d 130, 138 (D.D.C. 2012) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.* (*State Farm*), 463 U.S. 29, 43 (1983)). The court's review, however, is not toothless. The court must satisfy itself that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (internal quotation marks omitted). Where an agency "has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action." *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999) (quoting *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1222 (D.C. Cir. 1999)). "Moreover, an agency cannot fail to consider an important aspect of the problem or offer an explanation for its decision

that runs counter to the evidence before it." *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 57 (D.C. Cir. 2015) (cleaned up).

### B.      Preliminary Injunction

The court applies a four-part test to evaluate the *Filazapovich* and *Goodluck* Plaintiffs' motions for a preliminary injunction.  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Prior to *Winter*, courts in this Circuit had employed a sliding-scale analysis in which "a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011).  *Winter* arguably casts some doubt on that approach.  *See id.*  At a minimum, the D.C. Circuit has explained, *Winter* means that a plaintiff must demonstrate "a likelihood of success [a]s an independent, free-standing requirement" to secure a stay or preliminary injunction.  *See id.* at 393.  And, of course, equitable relief is warranted only upon a showing that irreparable injury is likely absent an injunction.  *See Winter*, 555 U.S. at 22.  Therefore, although the court applies the sliding scale here, because neither the Supreme Court nor the D.C. Circuit has expressly overruled that approach, the court must be satisfied that the *Filazapovich* and *Goodluck* Plaintiffs have established both a likelihood of success and irreparable harm to award injunctive relief.

## III.    DISCUSSION

Defendants have raised a number of issues concerning the justiciability of Plaintiffs' claims.  The court addresses these threshold issues first before turning to the merits of the parties' dispute.

A.      **Justiciability**

Defendants have raised five justiciability arguments:  (1) Plaintiffs do not have standing to challenge the No-Visa Policy, *Goh* Defs.' Br. at 21–25; Defs.' Mem. in Supp. of Their Mot. to Dismiss & in Opp'n to Pls.' Req. for Inj. Relief, *Filazapovich*, No. 21-cv-943, ECF No. 16 [hereinafter *Filazapovich* Defs.' Br.], at 19–22; Defs.' Mem. of P. & A. in Opp'n to Pls.' Mot. for a Prelim. Inj., *Goodluck*, No. 21-cv-1530, ECF No. 25 [hereinafter *Goodluck* Defs.' Br.], at 26–29; (2) the doctrine of consular nonreviewability precludes the court's jurisdiction over Plaintiffs' No-Visa Policy claims, *Goh* Defs.' Br. at 18–21; *Filazapovich* Defs.' Br. at 16–19; *Goodluck* Defs.' Br. at 18–25; (3) certain of the *Filazapovich* and *Goodluck* Plaintiffs' claims are moot because Proclamation 10014 and the regional travel bans are no longer in effect, *Filazapovich* Defs.' Br. at 22–23; *Goodluck* Defs.' Br. at 30–32; (4) the *Goh* Plaintiffs have not sued the appropriate party, *Goh* Defs.' Br. at 25–26; and (5) Plaintiffs whose visa applications have been adjudicated should be dismissed because their claims are moot, *Goh* Defs.' Br. at 18; *Filazapovich* Defs.' Br. at 22.

1.      *Standing*

The most substantial of Defendants' challenges is to Plaintiffs' standing.  "To establish standing, the plaintiff must show (1) it has suffered a concrete and particularized injury (2) that is fairly traceable to the challenged action of the defendant and (3) that is likely to be redressed by a favorable decision . . . ."  *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 376–77 (D.C. Cir. 2017) (cleaned up).  In a case with multiple plaintiffs, "the court need only find one plaintiff who has standing" to proceed.  *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014).

Plaintiffs bear the burden of establishing standing, and "[e]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the

manner and degree of evidence required at the successive stages of the litigation." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted). The court applies the same standard at both the preliminary injunction and summary judgment phases, and thus, even in the preliminary injunction context, "the plaintiff cannot 'rest on mere allegations, but must set forth by affidavit or other evidence specific facts' that, if 'taken to be true,' demonstrate a substantial likelihood of standing." *Elec. Privacy Info. Ctr.*, 878 F.3d at 377 (alteration omitted) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Accordingly, while the *Goh* Plaintiffs seek summary judgment and the *Filazapovich* and *Goodluck* Plaintiffs seek a preliminary injunction, the court applies the same standard to each case.

a.   <u>Injury in fact</u>

The injury-in-fact inquiry in these cases differs fundamentally from that in *Gomez*. There, because the State Department was refusing to adjudicate any DV-2020 applications that did not meet Proclamation 10014's national-interest exception at the time the plaintiffs filed suit, the injury was apparent: "the withholding of statutorily mandated, non-discretionary review and adjudication of [their] visa applications," paired with a concrete interest in entering the country. *Gomez I*, 485 F. Supp. 3d at 171. The loss of a procedural right to visa adjudication therefore was a certainty in *Gomez* absent judicial intervention.

Plaintiffs in this case are differently situated. When they filed suit, the State Department had resumed diversity visa processing and months remained before the end of the fiscal year for the agency to process any given Plaintiff's DV-2021 application. Therefore, unlike in *Gomez*, no Plaintiff could say for certain that their visa adjudication would not occur before the end of the fiscal year. Plaintiffs in these cases thus have advanced a different theory of injury: the State Department's refusal to process diversity visa applications for a nearly five-month period and their

improper deprioritizing of such processing *increased their risk* of not receiving an adjudication of their diversity visa applications before the end of FY 2021.  *See Goh* Pls.' Br. at 15–18 ("[T]he harm Plaintiffs face is the deprivation of even an opportunity to have their visa applications processed before the September 30 deadline."); *Filazapovich* Pls.' Br. at 20–21 (claiming Defendants' actions "caus[ed] an ever increasing likelihood of future injury as [Plaintiffs] approach their 30 September 2021 deadline"); *Goodluck* Pls.' Br. at 2, 25–27 (claiming harm to "Plaintiffs' interest in obtaining a visa before September 30, 2021").  Thus, their claimed injury is an increased risk of suffering a procedural harm.

At the outset, Defendants attempt to parry this theory of injury because, they contend, Plaintiffs "were never guaranteed the opportunity to make a visa application."  *Goodluck* Defs.' Br. at 27; *see also Goh* Defs.' Br. at 23; *Filazapovich* Defs.' Br. at 20.  But this argument fails on two fronts.  First, even if each diversity visa selectee is not guaranteed to receive a visa, as this court held in *Gomez III*, the Immigration and Nationality Act ("INA") does, in fact, require that "immigrant visa applications shall be reviewed and adjudicated by a consular officer."  2021 WL 3663535, at *20 (quoting 8 U.S.C. § 1202(b)).  The statute thus grants Plaintiffs a procedural right to have their diversity applications adjudicated, and a procedural injury can be sufficient to establish standing.  *See id.*  Second, Defendants overlook this Circuit's allowance for standing where a plaintiff faces "a substantially increased risk of harm" due to a defendant's conduct.  *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1295 (D.C. Cir. 2007).  Plaintiffs here assert that the State Department's unlawful cessation and deprioritizing of DV-2021 visa adjudications puts them at increased risk of losing a procedural right—an adjudication of their visa applications before the end of the fiscal year.  That is a cognizable theory of standing.

To sustain such a claim, Plaintiffs must "show both (i) a *substantially* increased risk of harm and (ii) a *substantial* probability of harm with that increase taken into account." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914 (D.C. Cir. 2015) (internal quotation marks omitted).  "In applying this standard," the court must bear in mind "that the constitutional requirement of imminence as articulated by the Supreme Court necessarily compels a very strict understanding of what increases in risk and overall risk levels count as 'substantial.'" *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 513 F.3d 234, 237–38 (D.C. Cir. 2008) (cleaned up).

After oral argument, the court was uncertain as to whether Plaintiffs had made such a showing because they had not "identif[ied] precisely *who* among the group [of Plaintiffs] faces" a sufficiently imminent risk that their diversity visa applications will not be adjudicated.  Order, *Goh*, 21-cv-999, ECF No. 33, at 3 (noting "Plaintiffs face a[n] . . . 'imminence problem' here"). Having received the parties' supplemental briefing, the court concludes that the *Goh* and *Goodluck* Plaintiffs have demonstrated that at least one Plaintiff has a sufficiently imminent injury in fact, but the *Filazapovich* Plaintiffs have not.

**Goh.**  Plaintiff Alena Yurchenko is a DV-2021 selectee with case number 2021EU3154; her application is being processed by the U.S. consulate in Ankara, Turkey.  Pls.' Suppl. Filing on Standing, *Goh*, 21-cv-999, ECF No. 34 [hereinafter *Goh* Pls.' Standing Br.], at 5; *Goh* Pls.' Standing Br., Ex. B, ECF No. 34-2 [hereinafter Yurchenko Aff.], at 1.  According to Yurchenko's affidavit, her case has been documentarily qualified since August 28, 2020—before the start of the 2021 fiscal year.  *See Goh* Pls.' Standing Br. at 5; Yurchenko Aff. at 1.  The State Department's visa bulletin indicates that her visa number became current in November 2020.  *See* U.S. Dep't of State, Bureau of Consular Affs., Visa Bulletin for November 2020 (last visited Aug. 25, 2021), https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2021/visa-bulletin-for-

november-2020.html (providing that visa numbers up to 4,000 for European applicants were current). Thus, Yurchenko became eligible for an interview less than two months into the fiscal year. Through June 2021, the Ankara consulate where Yurchenko's application would be adjudicated had not issued *any* DV-2021 visas and, as of July 21, 2021, had scheduled just 231 DV-2021 cases for interviews. *See Goh* Pls.' Standing Br., Ex. A, Aff. of Tuna Zergecit, ECF No. 34-1, at 1. Nonetheless, nine months after becoming eligible for an interview, Yurchenko has not been scheduled for one. *See Goh* Pls.' Standing Br. at 5; Yurchenko Aff. at 1. With less than thirty days remaining before the end of the fiscal year, and no immediate prospect of an interview in sight, Yurchenko has established both a substantially increased risk of losing out on her right to a visa adjudication and a substantial probability of such harm.

Defendants primarily make two arguments in response. First, they argue that their actions did not "*substantially* increase[] the risk of Plaintiff Yurchenko not receiving an adjudication of her diversity visa case" because "the U.S. Embassy in Ankara operated at a significantly reduced capacity over fiscal year 2021" due to COVID-19. Defs.' Resp. to Pls.' Suppl. Filing on Standing, *Goh*, 21-cv-999, ECF No. 37 [*Goh* Defs.' Standing Br.], at 8. They note that the consulate in Ankara "was reduced to 20 percent staffing" between November 2020 and February 12, 2021, and "increased staffing to 50 percent" on February 12, 2021. *Goh* Defs.' Standing Br., Decl. of Neal Vermillion, ECF No. 37-1, ¶ 7. Second, they argue that Plaintiffs cannot demonstrate a substantial increase in the risk that their visa applications will not be adjudicated because they fail to account for the fact that the COVID-19 pandemic forced the State Department to implement prioritization policies that limited the number of diversity visas that consular posts could adjudicate. *Goh* Defs.' Standing Br. at 6–7.

Neither of these arguments is convincing.  First, while the court does not deny that the COVID-19 pandemic has dramatically reduced the capacity of U.S. consular posts abroad to adjudicate visa applications, *see Gomez III*, 2021 WL 3663535, at *19, Plaintiff Yurchenko has demonstrated that even considering the impact of the COVID-19 pandemic, it is substantially likely she would have received her visa but for Defendants' unlawful actions.  Yurchenko was documentarily qualified prior to the start of the fiscal year, and her visa number became current in November 2020.  In the ten intervening months between when Yurchenko's application was ready for adjudication and the end of the Fiscal Year, the court finds it substantially likely that even a consulate working at 20%, and now at 50%, would have adjudicated Yurchenko's application but for Defendants' unlawful policies.  And with just over one month left of the 2021 fiscal year, she is now unlikely to receive an interview or visa.  Second, as to the impact of Defendants' prioritization scheme on the likelihood that a Plaintiff's visa will be adjudicated, the court must assume, for purposes of the standing analysis, that Plaintiffs will be successful on the merits.  *See Est. of Boyland v. U.S. Dep't of Agric.*, 913 F.3d 117, 123 (D.C. Cir. 2019) ("[W]hen considering whether a plaintiff has Article III standing, a federal court must assume, *arguendo*, the merits of his or her legal claim." (internal quotation marks omitted) (quoting *Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007))).  That means the court must assume that Defendants' prioritization scheme is unlawful.  Thus, it is no defense that the prioritization scheme makes it less likely that Yurchenko's application would have been processed because Yurchenko has alleged that the scheme contributed to her injury.  *See, e.g.*, *Goh* Am. Compl. ¶ 102 ("[Defendants'] failure to prioritize DV-2021 visa adjudications despite the looming deadline ha[s] caused unreasonable delay.").  The court accordingly concludes that Yurchenko has established a sufficiently imminent injury in fact.

**Goodluck**.   Plaintiff Jacob Sannoh has been documentarily qualified since September 4, 2020, and his assigned case number, 2021AF1776, became current in October 2020.   *See Goodluck*, No. 21-cv-1530, ECF No. 37 [hereinafter *Goodluck* Pls.' Standing Br.], at 8; *Goodluck* Pls.' Standing Br., Ex. 7, ECF No. 37-7; *see also* U.S. Dep't of State, Bureau of Consular Affs., Visa Bulletin for October 2020, https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2021/visa-bulletin-for-october-2020.html (last visited Aug. 25, 2021).   Sannoh's visa application is being processed at the U.S. embassy in Monrovia, Liberia.   *Goodluck* Pls.' Standing Br. at 8.   The U.S. Embassy in Monrovia did not provide any DV-2021 interviews between October 2020 and May 2021 and has scheduled ten interviews for June 2021 and ten interviews for July 2021.   Defs.' Response in Opp'n to Pls.' Suppl. Br. on Standing, *Goodluck*, No. 21-cv-1530, ECF No. 40 [hereinafter *Goodluck* Defs.' Standing Br.], Decl. of Rebecca Austin, ECF No. 40-3 [hereinafter *Goodluck* Austin Decl.], ¶ 16.   Thus, despite being documentarily qualified and current from the outset of the fiscal year, Sannoh still has not been scheduled for an interview.

In response to these facts, Defendants raise the same argument about the prioritization scheme that the court has already rejected, *see Goodluck* Defs.' Standing Br. at 6–7.   For the same reasons that argument was not persuasive as to the *Goh* Plaintiffs, it is not persuasive here.   They also argue that Sannoh does not have standing because the only reason his application has not been processed is that the COVID-19 pandemic reduced the Monrovia post's operating capacity and has caused "continued delays" there.   *Goodluck* Defs.' Standing Br. at 8.   The Monrovia consulate, however, provides a textbook example of how Defendants' implementation of the Proclamations and prioritization guidance impacted DV-2021 processing.   Defendants represent that the Monrovia Embassy reduced its operations by just 26% during the COVID-19 pandemic.   *See id.* (citing *Goodluck* Austin Decl. ¶ 16).   That means that, at nearly 75% operating capacity, the

Monrovia consulate did not schedule *any* DV-2021 interviews until June 2021.  *See Goodluck Austin* Decl. ¶ 16.  Rather than the pandemic alone hampering DV-2021 processing, the data from the Monrovia consulate supports Plaintiffs' theory that Defendants' decision not to process DV-2021 applications while Proclamation 10014 was in effect and its deprioritizing of diversity visas substantially increased the likelihood that Sannoh would not have his visa adjudicated.  As Sannoh's visa application was ready for adjudication at the very beginning of the 2021 fiscal year, even with reduced capacity due to the COVID-19 pandemic, a consulate operating at nearly 75% capacity surely would have been able to process an early-qualifying diversity visa application before the end of the fiscal year.  With just one month of the fiscal year left, Sannoh is substantially unlikely to have his diversity visa application processed at all.  Sannoh therefore has established an injury in fact.

*Filazapovich*.  The *Filazapovich* Plaintiffs point to nine Plaintiffs (Siarhei Filazapovich, Maryia Ilyushenka, Dzianis Zinkovich, Hanna Barysava, Natallia Chekanina, Artem Rossa, Ihar Semianida, Yauheni Bakhanovich, and Dzianis Dudaru) that they claim "had filed their DS-260 application[,] were documentarily qualified[,] . . . and should have had their interview scheduled" as of the date their Complaint was filed on April 6, 2021.  Pls.' Suppl. Br. on the Standing, *Filazapovich*, No. 21-cv-943, ECF No. 22 [hereinafter *Filazapovich* Pls.' Standing Br.], at 4.  Although the *Filazapovich* Plaintiffs have identified individual Plaintiffs that they claim have standing, there are substantial issues with the evidence they have presented.

*First*, the record does not contain any affidavit or other evidence to support the claims of Plaintiff Bakhanovich.  His claims are therefore not sufficiently supported for the court to conclude that he has standing at the preliminary injunction stage.  *See Elec. Privacy Info. Ctr.*, 878 F.3d

at 377 (requiring the court to evaluate standing at the preliminary injunction stage under the summary judgment standard).

*Second*, Defendants have produced an affidavit asserting—and Plaintiffs have not rebutted or presented any evidence otherwise—that Plaintiffs Ilyushenka and Bakhanovich have had their interviews scheduled.  Defs.' Reply in Opp'n to Pls.' Suppl. Brief on Standing, *Filazapovich*, No. 21-cv-943, ECF No. 25 [hereinafter *Filazapovich* Defs.' Standing Br.], at 8–9.  Because these Plaintiffs have reached the final stage of visa adjudication, *Filazapovich* Defs.' Standing Br., Decl. of Morgan Miles, ECF No. 25-5 [hereinafter *Filazapovich* Second Miles Decl.], ¶¶ 5–6; *see also Almaqrami*, 933 F.3d at 777 (noting that after the selectee "schedule[s] a consular interview," he shall be issued a diversity visa "if he meets the criteria to obtain one"), they lack the requisite injury in fact.  *Food & Water Watch*, 808 F.3d at 914.

*Third*, Plaintiffs Barysava, Chekanina, and Semianida have had their visas adjudicated. *See Filazapovich* Defs.' Standing Br. at 9.  Because these Plaintiffs have obtained the relief that they seek, their claims are moot.  *See Chafin v. Chafin*, 568 U.S. 165, 173 (2013) (noting "a case becomes moot . . . when it is impossible for a court to grant any effectual relief whatever to the prevailing party" (internal quotation marks omitted)).

That leaves just four individual Plaintiffs who might make a showing of standing: Filazapovich, Zinkovich, Rossa, and Dudaru.  These Plaintiffs only recently became documentarily qualified.  According to Defendants, Filazapovich's case was not documentarily qualified until June 7, 2021; Zinkovich's case was not documentarily qualified until June 29, 2021; Dudaru's case was not documentarily qualified until May 7, 2021; and Rossa's case is still not documentarily qualified.  *See Filazapovich* Defs.' Standing Br. at 8–9.  The court must adopt a "strict understanding of what increases in risk and overall risk levels can count as 'substantial,'"

*Pub. Citizen*, 489 F.3d at 460, and on this record, the court cannot conclude that Plaintiffs who were not eligible for an interview until May 7, 2021—after Defendants had resumed processing visas—have demonstrated that Defendants' actions *substantially* increased the risk that their visa applications will not be adjudicated.  These four Plaintiffs were not documentarily qualified for most of the 2021 Fiscal Year, and the court cannot conclude that Defendants' delays—and not the Plaintiffs' own delays in becoming documentarily qualified—account for the lack of progress on their visa applications.

Plaintiffs appear to argue that their cases were not documentarily qualified because Defendants "ceased all KCC activities on Plaintiffs' cases until 8 April 2021." *Filazapovich* Pls.' Standing Br. at 4.  First and foremost, Plaintiffs have not brought a challenge to the speed with which KCC processed documents, and an injury that was caused by KCC's failure to process documents is therefore not sufficient to confer standing.  *See, e.g.*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (injury must "be fairly traceable to the *challenged action* of the defendant" (emphasis added)).  But even if the court entertained this argument, Plaintiffs make the assertion that KCC stopped processing documents without citing to any evidence to back it up, and Defendants have submitted contrary evidence.  A KCC official submitted an affidavit stating that "[i]n June of 2020, KCC began opening and reviewing application packets for DV-2021 cases." *Filazapovich* Miles Decl. ¶ 2; *see also* Hr'g Tr. at 38:20–22 (stating that, prior to the expiration of Proclamation 10014, "the applications that were getting submitted by DV-2021 applicants was [sic] being processed at KCC").  Indeed, the experience of other *Filazapovich* Plaintiffs indicates that KCC was in fact processing DV-2021 applications while the Presidential Proclamations were still in effect—at least three *Filazapovich* Plaintiffs were deemed "documentarily qualified" as of November 1, 2020. *See Filazapovich* Defs.' Br., Decl. of Morgan

Miles, ECF No. 15-2 [hereinafter *Filazapovich* First Miles Decl.], ¶ 25; *Filazapovich* Pls.'
Standing Br. at 4 (citing *Filazapovich* First Miles Decl. ¶ 25).

Moreover, the *Filazapovich* Plaintiffs have not offered any evidence to demonstrate that
KCC took longer to process diversity visa applications in the 2021 Fiscal Year than in the past,
nor have they provided the court with any metric to determine how quickly KCC would normally
be expected to process visa applications.  The court therefore cannot conclude that it was KCC's
lack of diligence—as opposed to Plaintiffs' failure to provide all required documentation in a
timely fashion—that caused the visa applications of Plaintiffs Filazapovich, Zinkovich, Rossa, and
Dudaru to not become documentarily qualified until recently.  The court therefore concludes that
no *Filazapovich* Plaintiff has standing.[4]

*      *      *

After supplemental briefing on standing was complete, Defendants brought Judge
Lamberth's recent decision in *Gjoci v. Department of State*, No. 21-cv-294-RCL, 2021 WL
3912143 (D.D.C. Sept. 1, 2021), to the court's attention.  *See* Notice of Suppl. Auth., *Goodluck*,
21-cv-1530, ECF No. 45.  In *Gjoci*, the court concluded that the plaintiffs, who were diversity visa
selectees in Nepal, had not adequately established standing to challenge the State Department's
policies because the COVID-19 pandemic had effectively crippled the U.S. embassy's ability to
process visas.  2021 WL 3912143, at *14.  *Gjoci* differs materially from this case, however,
because all three plaintiffs that sought to establish standing in *Gjoci* were required to have their
visas processed at the embassy in Kathmandu, and Defendants provided extensive evidence that

---

[4] The *Filazapovich* Plaintiffs also argue that they have standing because they seek nominal damages, *Filazapovich*
Pls.' Standing Br. at 6, but that argument pertains only to redressability and does not create an independent injury in
fact.  *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 798 (2021) (holding that "nominal damages can redress a past
injury").  Because the court concludes that the *Filazapovich* Plaintiffs' standing fails on the separate injury prong, it
does not reach this argument.

COVID-19 conditions forced repeated closures of the Kathmandu embassy. *Id.* Indeed, the court noted that "[s]ince the end of lockdown in September 2020," the number of staff at the Kathmandu embassy has "ranged from four to nine per day, compared to a full staff of 29 from before the pandemic." *Id.* Moreover, the local government had ordered a lockdown, leading to the cancellation of one plaintiff's scheduled interview. *Id.* at 15. Based on these factors, Judge Lamberth could not conclude that the plaintiffs' "interests would be better protected in the absence of defendants' policies, especially when defendants are unable to schedule interviews because of COVID-19 and related lockdowns imposed by local governments." *Id.* Defendants here have not presented comparable evidence. To be sure, with respect to Plaintiff Yurchenko, they have presented evidence that the Ankara embassy "was reduced to 20 percent staffing" in November 2020, but by February 12, 2021, that number had "increased . . . to 50 percent." *See Goh* Defs.' Standing Br., Decl. of Neal Vermillion, ECF No. 37-1, ¶ 7. Defendants have presented no evidence that the Ankara embassy was fully incapacitated by local officials. Defendants' evidence with respect to Plaintiff Sannoh and the Monrovia embassy is even weaker. The Monrovia consulate decreased its processing capacity by just 26% due to COVID-19, and Defendants have not said the embassy was ever shut down by the local government. *See Goodluck* Defs.' Standing Br. at 5. The evidence of dramatic capacity reduction presented in *Gjoci* simply does not exist in this case, and particularly given Yurchenko's and Sannoh's early documentary qualification, the court concludes that Defendants' challenged actions substantially increased the risk that Yurchenko and Sannoh will not have their DV-2021 applications processed before the end of the fiscal year.

In sum, the court concludes that the *Goh* and *Goodluck* Plaintiffs have demonstrated that there is a substantial risk that their DV-2021 applications will not be adjudicated, and Defendants' conduct has substantially increased the likelihood that the *Goh* and *Goodluck* Plaintiffs' DV-2021

applications will not be adjudicated.   The *Goh* and *Goodluck* Plaintiffs therefore have demonstrated an imminent injury in fact.

b.   <u>Causation</u>

Defendants also argue that Plaintiffs cannot establish that Defendants' allegedly unlawful conduct caused their injury because the COVID-19 pandemic is the true cause of their injuries. *See Goh* Defs.' Br. at 24; *Goodluck* Defs.' Br. at 28.   But a defendant's actions need not be the only cause of a plaintiff's injury to establish standing.   "Article III standing does not require that the defendant be the most immediate cause, or even a proximate cause, of the plaintiffs' injuries; it requires only that those injuries be 'fairly traceable' to the defendant."   *Attias v. Carefirst, Inc.*, 865 F.3d 620, 629 (D.C. Cir. 2017) (quoting *Lexmark Int'l, Inc. v. Static Ctrl. Components, Inc.*, 134 S. Ct. 1377, 1391 n.6 (2014)).   Even taking into account the effects of COVID-19 on the operating capacity of consulates worldwide, Plaintiffs Yurchenko's and Sannoh's applications were ripe for adjudication so early in the fiscal year that Defendants were capable of processing their applications.   Defendants have not denied that they did not process DV-2021 applications for five months of the fiscal year or that the prioritization scheme has appreciably reduced their processing.   Plaintiffs thus have demonstrated that Defendants' policies contributed to the risk that they will not have their DV-2021 applications timely adjudicated.   That is all that is required.

c.   <u>Redressability</u>

On the third and final prong of standing, redressability, Defendants argue that because Plaintiffs are no longer subject to Proclamation 10014 and its implementing policies, the court cannot afford the only relief available under the APA—to "hold unlawful and set aside" the agency's actions.   *Goh* Defs.' Standing Br. at 2 (quoting 5 U.S.C. § 706(2)); *Goodluck* Defs.' Standing Br. at 2–3.

29

As this court held in *Gomez III*, however, the D.C. Circuit has rejected Defendants' position. *See Gomez III*, 2021 WL 3663535, at *9 (citing *Almaqrami*, 933 F.3d at 781–84). In *Almaqrami*, plaintiffs who were subject to one of the Trump Administration's "travel bans" sought and obtained a court order reserving unused diversity visa numbers prior to the end of the fiscal year. 933 F.3d at 777–78. The D.C. Circuit was asked to determine whether the *Almaqrami* plaintiffs' claims became moot at the end of the fiscal year when the plaintiffs' eligibility for a diversity visa expired. *Id.* at 779–80. The court instructed that it "must assume that the plaintiff will 'prevail' unless her argument that the relief sought is legally available and that she is entitled to it is 'so implausible that it is insufficient to preserve jurisdiction.'" *Id.* at 779 (quoting *Chafin*, 568 U.S. at 174). The court concluded that relief was plausibly available for the *Almaqrami* plaintiffs even after the end of the fiscal year because the court could order the government to process the withheld visas. Where "[t]he plaintiff files suit and the court grants *some* relief—but not the visa—before October 1," the court held, "after the selection FY has ended, the court might lawfully take steps to compel the government to process the plaintiff's application and issue her a diversity visa anyway." *Id.* at 780.

Here, just as in *Almaqrami* and *Gomez III*, Plaintiffs have sought a court order reserving unused visas prior to the close of the fiscal year; they therefore have stated a plausible claim to relief. *See Gomez III*, 2021 WL 3663535, at *9. The possibility that the court could reserve visas for Plaintiffs and order the State Department to process them "could result in Plaintiffs receiving a visa and immigrating to the United States," and that "is sufficient to preserve the court's subject matter jurisdiction over Plaintiffs' claims." *Id.* (cleaned up) (quoting *Almaqrami*, 933 F.3d at 783). The court therefore has power to redress Plaintiffs' injuries, and the *Goh* and *Goodluck* Plaintiffs have standing.

2.      *Doctrine of Consular Nonreviewability*

Defendants also argue that Plaintiffs' claims are nonjusticiable because the doctrine of consular nonreviewability precludes judicial review.  *See Goh* Defs.' Br. at 18–21; *Goodluck* Defs.' Br. at 18–25.  Defendants have resurrected this argument wholesale from their summary judgment arguments in *Gomez III*.  For the same reasons that the court rejected this position in *Gomez III*, Defendants' expansive interpretation of consular nonreviewability is unavailing here as well.  *See Gomez III*, 2021 WL 3663535, at *10–11.  *First*, Defendants' reliance on authority that insulates Congress's ability to legislate rules regarding the admission of aliens is inapposite to the question presented here of whether the Executive Branch adhered to Congress's mandates in the INA and the APA.  *See id.* at *10 (discussing *Fiallo v. Bell*, 430 U.S. 787 (1977)).  *Second*, Plaintiffs have challenged the State Department's general policies—refusing to review and adjudicate their visas and giving their visa applications low priority—not an individual visa determination.  The D.C. Circuit has expressly recognized that such challenges are reviewable. *See id.* at *11 (citing *Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798 (D.C. Cir. 1985)).  *Third*, the court again rejects Defendants' contention that "courts may not review decisions to exclude non-citizens 'unless expressly authorized by law,'" *e.g.*, *Goh* Defs.' Br. at 19 (quoting *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542–43 (1950)), because Defendants have not identified any authority establishing that judicial review is not available "where Congress has commanded action by the executive branch to adjudicate diversity visa applications and where Congress has not expressly rejected a cause of action," *Gomez III*, 2021 WL 3663535, at *11.  If anything, the presumption favoring judicial review of agency action under the APA is just the opposite.  *See Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 99 (D.C. Cir. 2021).

Accordingly, the court again concludes that principles of consular nonreviewability do not preclude judicial review of Plaintiffs' claims.

### 3.    Mootness

Defendants make two arguments regarding mootness.  First, they argue that the *Goodluck* Plaintiffs' claims regarding the No-Visa Policy are moot because Proclamation 10014 and the regional travel bans are no longer in effect.  *See Goodluck* Defs.' Br. at 30–32.  Because "the relief that Plaintiffs seek has already been obtained" by the recission of the Proclamation and the regional travel bans, Defendants suggest, this court cannot grant Plaintiffs relief and their claims are moot. *See id*.  Second, Defendants argue that Plaintiffs whose visa applications have been adjudicated should have their claims dismissed as moot.  *Goh* Defs.' Br. at 18.

While framed as a mootness concern, Defendants' first argument is really one about standing.  "Mootness has been described as the doctrine of standing set in a time frame:  The requisite personal interest that must exist at the commencement of the litigation (standing) must continue through its existence (mootness)."  *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997) (internal quotation marks omitted); *see also Gomez III*, 2021 WL 3663535, at *6.  Since the cases at issue were filed after Proclamation 10014 and the No-Visa Policy were revoked, their pre-suit revocation does not "moot" these later-arising challenges.  Defendants' argument is thus best understood as a challenge to Plaintiffs' standing.  *See Wheaton Coll. v. Sebelius*, 703 F.3d 551, 552 (D.C. Cir. 2012) (per curiam) ("[S]tanding is assessed at the time of filing . . . .").  Regardless, the court has already rejected this argument in the context of redressability:  Plaintiffs have identified a theory of relief—the reservation of DV-2021 numbers— that is not "wholly insubstantial" or "frivolous," and thus there remains a live controversy in this case.  *See Almaqrami*, 933 F.3d at 783 (internal quotation marks omitted).

But the court agrees with Defendants that Plaintiffs who have already had their DV-2021 applications adjudicated do not present a live case or controversy, and their claims must be dismissed as moot. They have received the remedy they seek. They therefore lack a cognizable injury and are dismissed from the case.

### 4. Improper Defendants

Defendants' last argument on justiciability is that the *Goh* Plaintiffs' claims for unreasonable delay and mandamus should be dismissed because neither the Secretary of State nor the Department of State "can adjudicate Plaintiffs' visa applications." *Goh* Defs.' Br. at 25. The theory goes that because the *Goh* Plaintiffs "do not seek to challenge a Department policy, rule, practice, or regulation," but instead "seek to compel further action on their DV21 visa cases," only the U.S. embassy or consulate can provide relief. *Id.* at 26. In making this argument, Defendants rely on a series of cases that establish that consular officers have the "exclusive authority to review applications for visas, precluding even the Secretary of State from controlling their determinations." *See Baan Rao Thai Rest. v. Pompeo*, 985 F.3d 1020, 1024 (D.C. Cir. 2021) (internal quotation marks omitted); *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1156 (D.C. Cir. 1999) ("The powers afforded to consular officers include, in particular, the granting, denying and revoking of immigrant and non-immigrant visas."). Plaintiffs, however, are not challenging a consular officer's *adjudication* of their DV-2021 visa application; they are challenging the State Department's policies halting and deprioritizing DV-2021 adjudications. *See Goh* Am. Compl. ¶ 102 ("Defendants' unlawful no-visa policy in the implementation of various proclamations which merely suspend entry under 8 U.S.C. § 1182(f) and their failure to prioritize DV-2021 visa adjudications despite the looming deadline have caused unreasonable delay."); *id.* ¶ 110 ("Defendants' unlawful no-visa policy in the implementation of various proclamations which

merely suspend entry under 8 U.S.C. § 1182(f) and their failure to prioritize DV-2021 visa adjudications despite the looming deadline have caused Plaintiffs' applications to not be adjudicated within a reasonable time.").  Defendants have identified no case that requires suit against a consular officer to challenge such policy decisions.

Further, in their reply brief, Defendants appear to concede that the Secretary has the authority to control the pace of review of visa applications.  They note that "the Secretary left with each respective chief of a U.S. embassy or consulate the discretion as to when to conduct interviews."  Defs.' Reply in Supp. of Defs.' Mot. to Dismiss, or, in the Alternative, for Summ. J., *Goh*, 21-cv-999, ECF No. 25 [hereinafter *Goh* Defs.' Reply], at 9.  The Secretary may have opted to delegate that authority, but he undoubtedly retains "any authority vested by law in any office or official of the Department of State."  22 U.S.C. § 2651a(a)(3)(A).  That much is clear from the record, which demonstrates that the challenged policies were issued on behalf of the Secretary, not at the consular level.  *See* DV-2021 CAR at 1–5 (guidance document signed by then–Secretary of State Michael Pompeo); Prioritization Announcement (issued by Department of State).  The Defendants before the court are therefore capable of providing the *Goh* Plaintiffs the relief they seek.

## B.    Merits Issues

With the justiciability arguments in the rearview mirror, the court turns to the merits.

### 1.    *No-Visa Policy*

Plaintiffs argue that Defendants' "No-Visa Policy," pursuant to which Defendants did not process diversity visas while Proclamation 10014's entry ban remained in effect, is contrary to law

and ultra vires.[5]  *See Goh* Pls.' Br. at 22–26; *Goodluck* Pls.' Br. at 27–28.  Defendants defend the No-Visa Policy as the inevitable legal consequence of the Proclamation's suspension of entry for diversity visa holders.  As they read the INA, "foreign nationals who . . . are subject to a suspension of entry under section 1182(f)" are "ineligible" to receive a visa.  *Goh* Defs.' Br. at 41–42 (internal quotation marks omitted).   This court has twice rejected Defendants' arguments that a Proclamation banning an immigrant from entry renders her ineligible for a visa under 8 U.S.C. § 1201(g).  *See Gomez I*, 485 F. Supp. 3d at 191–94; *Gomez III*, 2021 WL 3663535, at *11–15.  And at least three other district courts have agreed.  *See Tate v. Pompeo*, 513 F. Supp. 3d 132, 144–45 (D.D.C. 2021); *Milligan v. Pompeo*, 502 F. Supp. 3d 302, 316 (D.D.C. 2020); *Young v. Trump*, 506 F. Supp. 3d 921, 944–45 (N.D. Cal. 2020).  This time is no different.

Because Defendants have recycled their arguments on this issue from *Gomez III*, the court only briefly explains its reasons for rejecting them here.  The court's full reasoning can be found in *Gomez III.*  First, "[s]ection 1201(g) precludes the issuance of visas to only persons who are 'ineligible to *receive a visa*' under section 1182—it says nothing about persons who are ineligible *to enter* the country."  *Gomez III*, 2021 WL 3663535, at *12.  The Supreme Court's decision in *Hawaii v. Trump*, 138 S. Ct. 2392 (2018), does not support Defendants' contrary reading.  *See Goh* Defs.' Br. at 43.  In *Hawaii*, the Supreme Court noted that the INA distinguishes between "entry," on the one hand, and visa eligibility and issuance, on the other hand, on multiple occasions, and the Court explicitly stated that "[t]he concepts of entry and admission—*but not issuance of a visa*—are used interchangeably in the INA."  *Hawaii*, 138 S. Ct. at 2414 n.4 (emphasis added); *see*

---

[5] The *Goh* Plaintiffs also argue that the Secretary of State's implementation of the No-Visa Policy usurps the authority of consular officers to issue visas, in violation of 8 U.S.C. § 1201(a)(1).  *See Goh* Pls.' Br. at 26.  Because the court finds the No-Visa Policy unlawful on other grounds, it does not reach this question.

*also id.* at 2414 (rejecting interpretation of 8 U.S.C. § 1152(a)(1)(A) that "ignore[d] the basic distinction between admissibility determinations and visa issuance that runs throughout the INA").

Second, Defendants' insistence that the issuance of a visa to an applicant whose entry is banned under Proclamation 10014 constitutes an unlawful "attempt to enter the United States" under 8 U.S.C. § 1185(a)(1) gets them no further. *See Goh* Defs.' Br. at 44. The court again agrees with two other district courts that "[s]ection 1185(a)(1) says nothing about issuance of a visa," and issuing a visa and attempting to enter the United States "are distinct acts." *See Gomez III*, 2021 WL 3663535, at *13 (citing *Tate*, 513 F. Supp. 3d at 145; *Milligan*, 502 F. Supp. 3d at 316); *see also Saavedra Bruno*, 197 F.3d at 1157 ("Obtaining a visa from an American consul has never guaranteed an alien's entry into the United States."). Nor does the hodgepodge of other INA provisions that Defendants scrounge up, *see Goh* Defs.' Br. at 44–48, support a different interpretation: this court will not mix and match provisions of the INA because, "'in matters of immigration policy, where deference to the political branches is high, courts require clear legislative direction before adopting a reading of the statute that effects sweeping and monumental change in immigration policy.'" *Gomez III*, 2021 WL 3663535, at *15 (alterations omitted) (quoting *Wang v. Blinken*, 3 F. 4th 479, 483 (D.C. Cir. 2021)).

Third, Defendants' resort to the Automated Visa Lookout System to justify their interpretation of the INA suffers from the same flaws as it did in *Gomez*: Defendants have produced no evidence that any Plaintiff's name was entered into the system, nor have they explained "what consequences would follow from a consular officer's issuance of a visa to an individual listed in the system." *Id.* at *14. The Automated Visa Lookout System therefore does not justify Defendants' refusal to process diversity visa applications.

Fourth and finally, because the plain text of the INA does not support Defendants' position, the court cannot defer to "the Department's long-held understanding that the INA authorizes" visa refusal when an applicant is not allowed to enter the United States, *Goh* Defs.' Br. at 48. *See Gomez III*, 2021 WL 3663535, at *15 ("It is a basic tenet of administrative law that '[w]hen the words of a statute are unambiguous . . . judicial inquiry is complete.'" (alterations in original) (quoting *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 340 (D.C. Cir. 2020))).

2.       *Unreasonable Delay and Unlawful Withholding*

Plaintiffs next argue that Defendants have unreasonably delayed and unlawfully withheld adjudication of their visa applications in violation of section 706(1) of the APA. *See Goh* Pls.' Br. at 27–39; *Goodluck* Pls.' Br. at 34–39. Defendants attempt to cut Plaintiffs' section 706(1) claims off at the knees: they argue that they have not "failed" to take any action because they are processing DV-2021 applications again and that Plaintiffs have not identified a nondiscretionary duty that Defendants were required to take. *See Goh* Defs.' Br. at 26–27.

Defendants' first argument misapprehends the scope of the section 706(1) inquiry. The question is not whether Defendants have taken any action whatsoever—the question is whether Defendants have taken action vis-à-vis the specific Plaintiffs bringing the claims of unreasonable delay or unlawful withholding. Defendants have not identified any case law that suggests that because an agency acts on some similarly situated applications, it cannot be sued for unreasonably delaying or unlawfully withholding other applications.[6]

And as this court recently held in *Gomez III*, 8 U.S.C. § 1202(b) "imposes a mandatory duty on consular officers to review and adjudicate immigrant visa applications." *Gomez III*, 2021

---

[6] Defendants cite to *Tate* and *Milligan* for the proposition that Plaintiffs' section 706(1) claim "fails at the threshold" and is "speculative and premature." *See Goh* Defs.' Br. at 27. Neither of those cases short circuited an unreasonable delay analysis or found that Defendants had not failed to act. *See Tate*, 513 F. Supp. 3d at 148 (analyzing *TRAC* factors); *Milligan*, 502 F. Supp. 3d at 317–20.

WL 3663535, at *20.  Section 1202(b) requires that "immigrant visa applications *shall* be reviewed and adjudicated by a consular officer."  *Id.* (quoting 8 U.S.C. § 1202(b)).  Plaintiffs therefore have "point[ed] to a precise section of the INA," *Meina Xie v. Kerry*, 780 F.3d 405, 406 (D.C. Cir. 2015), that imposes "a mandatory duty," *see Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 671 (D.C. Cir. 2016) (noting that legislation that uses the word "'shall' indicates a mandatory duty").  Because Defendants had a specific and nondiscretionary obligation to review and adjudicate Plaintiffs' immigrant visa applications, their unreasonable delay and unlawful withholding claims can proceed.  *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004).

a.     Unreasonable delay

To determine whether Defendants have unreasonably delayed adjudication of Plaintiffs' DV-2021 applications, the court analyzes the six factors identified in *Telecommunications Research & Action Center v. FCC* (*TRAC*), 750 F.2d 70, 79–80 (D.C. Cir. 1984):

> (1) The time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is "unreasonably delayed."

*In re People's Mojahedin Org. of Iran*, 680 F.3d 832, 836-37 (D.C. Cir. 2012) (internal quotation marks omitted).  "[T]he central question is whether the agency's delay is so egregious as to warrant mandamus."  *Id.* at 837 (internal quotation marks omitted).

**Factors One and Two.**  In *Gomez I* and *III*, the court addressed Defendants' argument on factors one and two that Congress did not provide an express timetable by which Defendants must

adjudicate diversity visas, thereby giving the Secretary discretion to prioritize diversity visas as he sees fit.  The court concluded that, even though the INA does not provide an express timetable by which Defendants must process diversity visas, Congress gave "[an]other indication of the speed with which it expects" Defendants to process immigrant visas.  *TRAC*, 750 F.2d at 80.  That is, the fiscal year cutoff for processing diversity visas "manifests Congress's intent that the State Department undertake good-faith efforts to ensure that diversity visas are processed and issued before the deadline."  *Gomez I*, 485 F. Supp. 3d at 196; *see also Gomez III*, 2021 WL 3663535, at *19.  While the court appreciates that Defendants must balance other considerations in determining how quickly to process diversity visa applications—including the health of consular officers and the agency's backlog of visa applications, *see Goh* Defs.' Br. at 31–32; *Goodluck* Defs.' Br. at 36—Congress's instructions are the "most important" consideration in the *TRAC* analysis, *see People's Mojahedin*, 680 F.3d at 837 (internal quotation marks omitted).  Here, even if Congress could not have anticipated the COVID-19 pandemic, Congress legislated the fiscal year deadline knowing that the Department of State would have other, competing draws on its resources.  *See People's Mojahedin*, 680 F.3d at 837 ("Congress undoubtedly knew the enormous demands placed upon the Secretary and nonetheless limited her time to act on a petition for revocation . . . .").  And regardless of the Department's competing priorities, it was plainly unreasonable for it to stop processing visas for five months of FY 2021 based on an erroneous interpretation of the law.  *See Gomez III*, 2021 WL 3663535, at *19 ("A reasonable time for agency action is typically counted in weeks or months, not years; surely a delay that results in the *permanent* loss of a statutory benefit is not reasonable." (alteration omitted) (internal quotation marks omitted)).

Defendants also attempt to defend their delay as reasonable on the basis that KCC has not deemed many of the Plaintiffs before this court "documentarily qualified." *Goh* Defs.' Br. at 30. These arguments, however, do not address the issues identified in the first two factors—which concern the rule of reason and Congress's instructions, *see TRAC*, 750 F.2d at 80. Rather, they appear to be arguments that Plaintiffs have not suffered an injury, and the court has already determined that at least one Plaintiff in *Goh* and *Goodluck* has suffered an injury. That is all that is necessary for the court to consider Plaintiffs' unreasonable delay claims. *See, e.g., J.D. v. Azar*, 925 F.3d 1291, 1323 (D.C. Cir. 2019) ("It is settled that in a case involving joined, individual plaintiffs bringing a shared claim seeking a single remedy, Article III's case-or-controversy requirement is satisfied if one plaintiff can establish injury and standing.").

Accordingly, factors one and two favor Plaintiffs.

**Factors Three and Five.** The parties next dispute factors three and five—which concern health, welfare, and the interests prejudiced. Plaintiffs argue these factors fall in their favor because "[h]uman health and welfare is at stake" due to Defendants' delays and point to a number of Plaintiffs who have suffered particularly severe health and wellness consequences. *Goh* Pls.' Br. at 32; *Goodluck* Pls.' Br. at 36 ("Plaintiffs have lost gainful employment[] [and] educational opportunities, and are fearful that they will lose their chance at the American Dream."). Defendants respond that if they processed Plaintiffs' visa applications, then other applicants for immigration would be prejudiced in the same manner as Plaintiffs are now. *See Goh* Defs.' Br. at 36–37; *Goodluck* Defs.' Br. at 36. Moreover, they assert, Defendants would need to sacrifice "the health and welfare of the Department's workforce during the global pandemic" to accommodate Plaintiffs' demands. *See Goh* Defs.' Br. at 37–38.

On balance, the third and fifth factors favor Plaintiffs.  Plaintiffs have established "dire" prejudice because they "risk losing their (likely) once-in-a-lifetime opportunity to immigrate to the United States" and have demonstrated how delays in visa adjudication threaten their welfare. *See Gomez III*, 2021 WL 3663535, at *19.  Defendants' arguments that prioritizing Plaintiffs over other visa applicants will not yield a net positive improvement in human welfare are better suited to the fourth factor, and indeed are essentially a reprise of Defendants' arguments on that factor. *See TRAC*, 750 F.2d at 80 (specifying fourth factor as "the effect of expediting delayed action on agency activities of a higher or competing priority").  And while the court is sympathetic to the Department taking precautions to protect its employees, that argument fails for two reasons.  First, Defendants' decision not to process diversity visas for the first five months of the fiscal year was not taken in consideration of employees' health—it was taken based on an erroneous interpretation of the law.  *See* DV-2021 CAR at 29 (restricting adjudication of immigrant visas to "applicants that post believes may meet an exception to [Proclamation 10014]").  Defendants cannot belatedly justify that decision as a health precaution.  Second, Defendants have not produced any evidence of how increased processing of diversity visas would have endangered the health of Department employees, when phased re-opening of consular offices began in June 2020.  While the court can surmise that there might be some increased risk from COVID-19, Defendants have presented no evidence from which the court can say how much.  Particularly given that Defendants have moved for summary judgment in *Goh*, the court may not make such inferences without supporting facts.  Accordingly, the court concludes that the third and fifth *TRAC* factors favor Plaintiffs.

**Fourth Factor.**  Defendants argue that the fourth factor is dispositive because Plaintiffs' requested relief presents a textbook example of "reorder[ing] a queue of applicants seeking adjudication." *Goh* Defs.' Br. at 34 (internal quotation marks omitted) (quoting *Tate*, 513 F. Supp.

3d at 149); *Goodluck* Pls.' Br. at 37.  As the court noted in *Gomez III*, this fourth factor is the closest call.  2021 WL 3663535, at *19.  But Defendants did not comply with their statutory obligation to process diversity visas, *see* 8 U.S.C. § 1202(b), and their failure to do so unlawfully halted processing of Plaintiffs' applications for five months.  Defendants' complete cessation of processing diversity visas based on an erroneous interpretation of the law distinguishes Plaintiffs' cases from cases like *Tate*, where the plaintiffs relied "wholesale . . . on agency prioritization." 513 F. Supp. 3d at 149.  Here, a finding that Defendants unreasonably delayed processing Plaintiffs' applications is not a simple reorganization of the Department's priorities, *see Gomez III*, 2021 WL 3663535, at *19 (citing *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003)), but a rectification of Defendants' decision to flout the INA by sitting on its hands.  Moreover, the court's order will not require the State Department to prioritize DV-2021 applications over other visa applications.  Rather, it simply prohibits the State Department from relying on an erroneous interpretation of the law.  Put differently, the court's determination that the State Department has unreasonably delayed Plaintiffs' visa applications does not require the State Department to drop everything and process DV-2021 applications.

Accordingly, while the court understands that the COVID-19 pandemic has created a significant backlog of visa applications, the State Department's lack of resources to adequately confront that obstacle is not dispositive here.  The fourth factor therefore does not favor the agency, but is neutral in this situation.

**Sixth Factor.**  Finally, the sixth factor, which looks to agency impropriety, *TRAC*, 750 F.2d at 80, is similarly neutral.  Defendants argue that, as of February 2021, they began processing DV-2021 applications in good faith.  *See Goh* Defs.' Br. at 38–39.  Plaintiffs point out that Defendants were "on notice" that their No-Visa Policy was unlawful and would be "catastrophic"

to the DV-2021 program, but proceeded to apply the unlawful policy anyways, and thus the sixth factor points in their favor. *Goh* Pls.' Br. at 36–39. As it did in *Gomez III*, however, the court declines to wade into this battle because it "need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed." 2021 WL 3663535, at *20 (quoting *TRAC*, 750 F.2d at 80).

On balance, the *TRAC* factors support a finding that Defendants unreasonably delayed processing Plaintiffs' diversity visa applications when they declined to process any diversity visas for the first five months of the Fiscal Year. The court therefore grants summary judgment to the *Goh* Plaintiffs on their unreasonable delay claim and finds that the *Goodluck* Plaintiffs are likely to succeed on their unreasonable delay claim.

        b.    <u>Unlawfully withheld</u>

In addition to arguing that their visa adjudications were unreasonably delayed, the *Goodluck* Plaintiffs argue that their visa adjudications were unlawfully withheld because "Defendants improperly interpreted PP 10014 to refuse adjudication of diversity visas." Pls.' Reply in Supp. of Their Mot. for Prelim. Inj., *Goodluck*, No. 21-cv-1530, ECF No. 28, at 12; *see also Goodluck* Pls.' Br. at 39–40. To make out an unlawful withholding claim, Plaintiffs must demonstrate that the "agency failed to take a *discrete* agency action that it is *required to take*." *Norton*, 542 U.S. at 64. Defendants argue that they do not have a nondiscretionary duty to process diversity visas and therefore the *Goodluck* Plaintiffs are unlikely to succeed on their unlawful withholding claim. *See Goodluck* Defs.' Br. at 32–33.

The court has already held that 8 U.S.C. § 1202(b) imposes a nondiscretionary duty on Defendants to adjudicate diversity visas, *see supra* pp. 37–38, and it has likewise held that Defendants failed to adjudicate diversity visas contrary to law, *see supra* section III.B.1.

Accordingly, the court concludes that the *Goodluck* Plaintiffs are likely to succeed on the merits of their unlawful withholding claim.

>    3.    *Prioritization*

The *Goodluck* Plaintiffs argue that Defendants' various policy guidance—including the so-called "Diplomacy Strong," "Mission Critical," and prioritization frameworks—that deprioritizes diversity visas violates the APA because it is contrary to law and arbitrary and capricious. Specifically, Plaintiffs argue that (1) the State Department has not adequately justified the prioritization approach or considered the exceptionally harsh result of the prioritization approach on diversity visa applicants, *Goodluck* Pls.' Br. at 30–31; (2) the State Department violated its own regulations by not processing diversity visas until it reached the cap on diversity visas or the end of the fiscal year, *id.* at 33; (3) the State Department irrationally distinguished between age-out cases and diversity visa cases, *id.* at 33–34; and (4) the prioritization approach goes beyond the text of the statute by tying the number of diversity visas that can be processed to the number of immediate-relative visas processed, *id.* at 29.

Three threshold issues detain the court before considering whether the prioritization scheme is arbitrary and capricious. First, the *Goodluck* Plaintiffs have raised challenges to State Department policies that are no longer in effect. The mission-critical and Diplomacy Strong guidance were replaced with new guidance in November 2020. *See* DV-2021 CAR at 1 ("[P]osts are no longer obligated to be in a specific Diplomacy Strong phase to adjudicate a particular visa class as described in prior guidance."). The court lacks jurisdiction to entertain challenges to those rescinded policies. *See True the Vote, Inc. v. IRS*, 831 F.3d 551, 561 (D.C. Cir. 2016) ("As applied in the context of injunctive litigation, if there remains no conduct to be enjoined, then normally there is no relief that need be granted, the case or controversy has ceased, and the jurisdiction of

the court has expired under Article III.").  The court's analysis under the APA is therefore limited to the current prioritization scheme.[7]

Second, Defendants argue that Plaintiffs' challenges to the prioritization scheme are not reviewable "because decisions concerning the entry of noncitizens are presumed immune from judicial review, and there is no meaningful judicial standard available for the Court to assess, especially in the context of an unprecedented backlog arising from a pandemic."  Defs.' Br. at 23. The court disagrees.  There is a "strong presumption that Congress intends judicial review of administrative action" that can be overcome only by "clear and convincing evidence that Congress intended" such action to be unreviewable.  *Am. Hosp. Ass'n v. Azar*, 967 F.3d 818, 823–24 (D.C. Cir. 2020) (internal quotation marks omitted).  The exception to judicial review for agency "action committed to agency discretion" has been interpreted "quite narrowly" and is generally limited to decisions that are "traditionally" left to agency discretion.  *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2568 (2019).  The agency's decision must either (1) fall into "certain categories of administrative decisions that . . . [are] committed to agency discretion," such as "a decision not to institute enforcement proceedings" or to "allocat[e] . . . funds from a lump-sum" or (2) arise from a statute that "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 642 (D.C. Cir. 2020) (internal quotation marks omitted).

The State Department's prioritization scheme does not fall into either of those two categories.  To start, Defendants are wrong that Plaintiffs challenge a "decision[] concerning the entry of noncitizens."  Defs.' Br. at 23.  Plaintiffs instead challenge the State Department's

---

[7] To the extent the mission-critical and Diplomacy Strong policies were in effect during the first month of the 2021 fiscal year (October 2020) and impacted Plaintiffs, such impact was secondary to the State Department's erroneous understanding that a section 1182(f) entry restriction rendered Plaintiffs ineligible to receive a visa.

announced prioritization policy, and that general policy is reviewable.  *See OSG Bulk Ships, Inc.* *v. United States*, 132 F.3d 808, 812 (D.C. Cir. 1998) (noting courts "distinguish[] between 'an agency's statement of a *general enforcement policy*' and a '*single-shot* nonenforcement decision,' the former being reviewable even though the latter may not be" (quoting *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 676 (D.C. Cir. 1994))).  And there are meaningful standards by which the court can assess Defendants' prioritization policy because the INA and APA provide them.  In the INA, Congress expressly directed that "[a]ll immigrant visa applications *shall* be reviewed and adjudicated by a consular officer." 8 U.S.C. § 1202(b) (emphasis added).  Whatever else the State Department's prioritization policy accomplished, it needed to honor that directive. And in organizing its priorities, the State Department was required to act in accordance with the APA and not adopt a policy that was contrary to law or failed to consider important factors.  *See Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 n.12 (D.C. Cir. 1995) ("[T]he APA provides a default standard of judicial review—arbitrary and capricious—precisely for situations . . . where a statute does not otherwise provide a standard of judicial review.").  The State Department's prioritization policy is therefore reviewable.

The third threshold issue is where to look in the record to evaluate the legality of the current prioritization scheme.  There are two candidates:  the November 20, 2020 guidance ("November Guidance") and the April 2021 Immigration Visa Prioritization announcement ("April Announcement").  A brief explanation of both is instructive.  In the November Guidance, the State Department announced that posts were "no longer obligated to be in a specific Diplomacy Strong phase to adjudicate a particular visa class as described in prior guidance" and announced the four-tiered prioritization approach for immigrant visas.  DV-2021 CAR at 1–2.  The November Guidance placed diversity visa applicants in the fourth—and last—tier.  *Id.* at 2.  In addition, the

November Guidance instructed that posts should not process the applications of applicants whose entry was suspended by a Proclamation because such "applicants . . . are not eligible for visas." *Id.* at 3.  The November Guidance remained in effect when the Biden Administration took office. On February 19, 2021, the new administration issued a memo (the "February Memorandum") to consular posts "[i]n anticipation of the upcoming expiration of Presidential Proclamation (P.P.) 10014."  *Id.* at 47.  That memo instructed that the National Visa Center, KCC, "and consular sections worldwide [would] resume normal scheduling processes of all immigrant visa (IV) *and diversity visa* (DV) classifications, for appointments starting in April 2021."  *Id.* (emphasis added). The February memo further instructed that "[p]osts should continue to prioritize services to U.S. citizens, and thereafter follow the prioritization guidance regarding the phased resumption of visa services," *id.*, ostensibly referring to the November Guidance.

In April 2021 the State Department publicly announced this "Immigrant Visa Prioritization" plan and detailed the four-tier prioritization scheme.  *See* Prioritization Announcement.  That Announcement "recognize[d] that visa applicants, particularly those in Tiers Three and Four, will face continued delays" and "acknowledge[d] that certain programs, including the diversity visa program, operate on a fiscal year basis as required by law."  *Id.*  It explained, however, that "as a result of COVID the number of visas issued in lower-priority preference categories or in such programs as the diversity visa program likely will not approach the statutory ceiling in Fiscal Year 2021."  *Id.*

Three important record facts emerge from this history.  First, the November Guidance contains the prioritization scheme that is at issue in this action; neither the February Memorandum nor the April Announcement superseded the November Guidance as a new policy.  Defendants concede as much, both implicitly in their briefing and expressly at oral argument.  In their opening

brief in *Goh*, Defendants cite the November Guidance and provide a link that directs to the April Announcement. *See Goh* Defs.' Br. at 5 n.5. This suggests that Defendants view the November Guidance and the April Announcement as one and the same. And when questioned at oral argument about why the November Guidance was hyperlinked to a document dated April 2021, counsel for Defendants represented that "the government implemented the prioritization in November," and referred to the guidance that "starts on page 1 of the Goh Administrative Record." Hr'g Tr. at 119:2–15. He continued, "The government did not publicly announce the prioritization scheme that they had been applying since November until April 6th." *Id.* at 119:15–17. Based on Defendants' own representations, then, the court concludes that the November Guidance is the agency's original formulation of the prioritization scheme.

Second, unlike the November Guidance, the April Announcement does not incorporate or reference Defendants' erroneous understanding that Proclamation 10014's entry restriction rendered DV-2021 selectees ineligible to receive a visa. *Compare* Prioritization Announcement, *with* DV-2021 CAR at 3 (directing consular posts not to process visa applications from "applicants who are not eligible for visas" because of Proclamations 10014 and 10052). The State Department therefore never disavowed its incorrect legal position in the November Guidance.

Third, the April Announcement considers the impact of the prioritization scheme on diversity visa applicants, but the November Guidance does not. *Compare* Prioritization Announcement (acknowledging "that certain programs, including the diversity visa program, operate on a fiscal year basis as required by law" but concluding that "as a result of COVID the number of visas issued in lower-priority preference categories or in such programs as the diversity visa program likely will not approach the statutory ceiling in Fiscal Year 2021"), *with* DV-2021 CAR at 1–2 (not discussing this issue). The November Guidance does not acknowledge at all the

statutory fiscal-year deadline for diversity visas or the consequence of not timely processing DV-2021 applications.

These facts demarcate the record facts relevant to the court's APA review. "When an agency's initial explanation 'indicates the determinative reason for the final action taken,' the agency may elaborate later on that reason (or reasons) *but may not provide new ones*." *Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891, 1908 (2020) (alteration omitted) (emphasis added) (quoting *Camp v. Pitts*, 411 U.S. 138, 143 (1973) (per curiam)). The facts of *Regents of the University of California* are illustrative. There, the Department of Homeland Security had issued a memorandum explaining its decision to rescind the Deferred Action for Childhood Arrivals ("DACA") program in September 2017. *Id.* at 1907. When a new Secretary of Homeland Security was appointed, she reaffirmed the decision to rescind DACA, but issued a new memorandum that contained additional reasons for the rescission. *See id.* at 1908. The Supreme Court refused to consider the second memorandum. It explained that, in reaffirming its prior decision, the agency had not "deal[t] with the problem afresh by taking *new* agency action" and therefore could rely only on its initial reasons for taking the action. *Id.* (internal quotation marks omitted). The Court could not consider the second memo because it contained "impermissible *post hoc* rationalizations" and those rationalizations were "not properly before" it. *Id.* at 1909.

Like the second memorandum in the DACA decision, in this case the April Announcement cannot supply a new rationale for the visa prioritization scheme announced in the November Guidance. The State Department's decision to reaffirm its November Guidance in the April Announcement without taking "new agency action" means that the State Department can do no more than "elaborate" on its original reasons for creating the prioritization scheme. *See id.* at 1908.

Specifically, the State Department cannot rely on the April Announcement to erase the November Guidance's conclusion that the Proclamations prohibited visa issuance, and it cannot rely on the April Announcement's consideration of the effects of the prioritization scheme on diversity visa applicants, when the November Guidance failed to do so.  The court's APA analysis therefore focuses only on the reasons offered in the November Guidance for adopting the new prioritization scheme.  *See id.* (refusing to consider reasons for agency action that were "nowhere to be found in the" agency's original explanation).

The court concludes that the agency's November 2020 prioritization scheme as applied to diversity visa applicants is arbitrary and capricious.  The November Guidance instructed posts "to deprioritize categories of applicants who appear to be ineligible for visas, such as categories of applicants covered by Presidential Proclamations," including individuals subject to Proclamations 10014 and 10052.  DV-2021 CAR at 13.  "The Administrative Record reveals no justification" for the deprioritization of DV 2021 selectees other than "the incorrect assumption that it is compelled by the Proclamations and § 1201(g)."  *Gomez I*, 485 F. Supp. 3d at 194; *see also* DV-2021 CAR at 13 (instructing posts).  The prioritization scheme therefore is arbitrary and capricious because it relied on an erroneous interpretation of the law.  It also failed to "account for the serious consequences the policy would impose on DV[] selectees, whose opportunity to receive visas will expire by the end of this fiscal year."  *Gomez I*, 485 F. Supp. 3d at 194.  It is clear that statutory timetables for administering visas were important considerations to the State Department with respect to other visa categories—the November Guidance, for example, cites Congress's timetables for processing visa applications for fiancés and family preference cases as one reason such cases should receive priority adjudication.  *See* DV-2021 CAR at 1–2, 10–11.  Yet the November Guidance failed to even consider whether the fiscal year deadline for diversity visa

50

applicants merited similar priority.  The State Department therefore failed to consider an important problem in formulating the November Guidance.

Because the November Guidance relies on an erroneous interpretation of the law and fails to consider the policy's impact on an important constituency (diversity visa applicants), the *Goodluck* Plaintiffs have established that they are likely to succeed on the merits of their claim that the State Department's prioritization guidance is arbitrary and capricious as it applies to diversity visa applicants.  *See id.*; *Prill v. NLRB*, 755 F.2d 941, 948 (D.C. Cir. 1985); *see also State Farm*, 463 U.S. at 43 (noting agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem").

### 4.    *Mandamus Act*

The *Goodluck* Plaintiffs next argue that they are entitled to relief under the Mandamus Act, 28 U.S.C. § 1361.  *Goodluck* Pls.' Br. at 42–43.  Mandamus relief is available only if "there is no other adequate remedy available to the plaintiff."  *In re Medicare Reimbursement Litig.*, 414 F.3d 7, 11 (D.C. Cir. 2005) (internal quotation marks omitted).  The *Goodluck* Plaintiffs' claims under 5 U.S.C. § 706(1) "compel[ling] delayed agency action under the APA" provide them "essentially the same" relief as their Mandamus Act claim does.  *See Viet. Veterans of Am. v. Shineseki*, 599 F.3d 654, 659 n.6 (D.C. Cir. 2010); *see also Gomez III*, 2021 WL 3663535, at *22.  The court has already held that the *Goodluck* Plaintiffs are likely to succeed on their section 706(1) claims, and given the overlapping relief between their Mandamus Act claim and their section 706(1) claims, they are unlikely to succeed on the merits of their Mandamus Act claim.

### 5.    *Notice and Comment*

Finally, the *Goodluck* Plaintiffs argue that Defendants' implementation of the Proclamations was unlawfully promulgated without notice-and-comment rulemaking.  *Goodluck*

51

Pls.' Br. at 43–44.  They seek as relief on this claim "an order enjoining Defendants' unlawful policies, practices, and procedures" because of Defendants' alleged violation of 5 U.S.C. § 706(2)(D).  *See Goodluck* Compl. ¶ 271.  But because the Proclamations have been rescinded, the court cannot enjoin Defendants' policies under them, and Plaintiffs' claim is therefore moot. *See Almaqrami*, 933 F.3d at 783.

### C.      Irreparable Harm

Having concluded that the *Goodluck* Plaintiffs are likely to succeed on their APA claims (other than their notice-and-comment claim) challenging the No-Visa Policy and the prioritization scheme, the court must also consider whether they are "likely to suffer irreparable harm without an injunction."  *Doe v. Mattis*, 928 F.3d 1, 7 (D.C. Cir. 2019).  For an injury to satisfy the irreparable harm standard, it "must be both certain and great; it must be actual and not theoretical." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (internal quotation marks omitted).  The party seeking an injunction must also show that the injury complained of will "be beyond remediation."  *See id.*

The *Goodluck* Plaintiffs argue that they will suffer irreparable harm if their diversity visa applications are not adjudicated because they will lose their opportunity to immigrate to the United States.  *Goodluck* Pls.' Br. at 44.  Defendants argue that this does not constitute an irreparable injury because the *Goodluck* Plaintiffs were never "guaranteed" to have their diversity visa applications processed.  *Goodluck* Defs.' Br. at 39–40.

The court has little trouble concluding that the *Goodluck* Plaintiffs have established irreparable harm.  This court and others have held that the loss of the "opportunity to immigrate to the United States through the diversity visa program" constitutes an irreparable injury.  *See Gomez I*, 485 F. Supp. 3d at 200; *P.K. v. Tillerson*, 302 F. Supp. 3d 1, 10 (D.D.C. 2017) (granting

injunctive relief in light of "the potential irreparable harm that Plaintiffs face[d]" of not having their visas adjudicated). While it is true that Plaintiffs are not guaranteed to have their diversity visa applications adjudicated, they are entitled to the *opportunity* to have their visa adjudicated as prescribed by the INA, 8 U.S.C. § 1202(b). They risk permanently losing that opportunity at the conclusion of the 2021 fiscal year, and that permanent loss is irreparable. *See Gomez I*, 485 F. Supp. 3d at 200.

### D.   Balance of the Equities and Public Interest

The last hurdle that the *Goodluck* Plaintiffs must overcome to be entitled to a preliminary injunction is a demonstration that "the balance of the equities tips in [their] favor[] and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. The balance of the equities and the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Defendants argue that the *Goodluck* Plaintiffs cannot succeed on this final factor because Plaintiffs request an order that would contravene the State Department's authority to prioritize certain visa services above others and "effectively cripple" Defendants' ability to safely adjust State Department operations during the COVID-19 pandemic. *See Goodluck* Defs.' Br. at 41–42. The court cannot agree. It recognizes that the State Department must wade through a substantial backlog of visa applications, but the public and Plaintiffs have a countervailing interest "in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (internal quotation marks omitted). Thus, while the public certainly has an interest in Defendants processing other types of visas in addition to diversity visas, it also has an interest in diversity visa applicants like the *Goodluck* Plaintiffs having their applications considered without the delays perpetuated by

Defendants' unlawful actions.  In addition, although the COVID-19 pandemic has disrupted visa processing writ large, diversity visa applicants are in a unique position among visa applicants because their eligibility for a visa ends on the last day of the fiscal year.  Given such exigencies, the court concludes that the balance of the equities and the public interest favor injunctive relief in this case.

### E.    Remedy

The *Goh* and *Goodluck* Plaintiffs are entitled to relief on their claims that:  (1) the No-Visa Policy is contrary to law; (2) Defendants unreasonably delayed adjudication of their DV-2021 applications; (3) Defendants unlawfully withheld adjudication of their DV-2021 applications; and (4) Defendants' prioritization policy is arbitrary and capricious.  The court therefore turns to the appropriate remedy.  An injunction "is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents."  *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017).  Nevertheless, "[a]n injunction must be narrowly tailored to remedy the specific harm shown."  *Neb. Dep't of Health & Hum. Servs. v. Dep't of Health & Hum. Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) (internal quotation marks omitted).

Plaintiffs have requested numerous forms of relief.  The *Goh* Plaintiffs seek: (1) "an order requi[r]ing the immediate scheduling of interviews for Plaintiffs who have submitted the required documentation and the expeditious issuance of visas for those who are approved at interview," (2) "an order requiring Defendants to undertake all feasible efforts to ensure that all 55,000 DV-2021 visas are processed during the fiscal year," and (3) "reservation of any shortfall of the 55,000 allotted visas during the fiscal year."  *Goh* Pls.' Br. at 39.  The *Goodluck* Plaintiffs seek: (1) reservation of visa numbers for Plaintiffs, (2) declaratory relief, (3) an order enjoining

Defendants from implementing the No-Visa Policy or prioritization guidance, and (4) an order mandating Defendants process visa applications, schedule interviews for Plaintiffs, and issue visas to eligible Plaintiffs. *Goodluck* Pls.' Br. at 45. Defendants vigorously contest the court's ability to reserve visa numbers for processing after the fiscal year has expired, and the *Goh* Defendants contend that the court cannot order them to undertake feasible efforts to process all 55,000 available diversity visas before the end of the fiscal year. *See Goh* Defs.' Br. at 53–60; *Goodluck* Defs.' Br. at 42–44; *Goh* Defs.' Reply at 23. Defendants do not specifically object to the other relief that Plaintiffs seek.

This court recently addressed Defendants' objections to the scope of its equitable power to reserve visas and rejected them. *See Gomez III*, 2021 WL 3663535, at *22–23. In *Gomez III*, the court explained that it "retains [the] power to grant relief to a plaintiff who seeks relief prior to the close of the fiscal year," and thus could order Defendants to process reserved DV-2020 numbers. *Id.* at *23. The court stands by that conclusion here. It declines, however, to reserve DV-2021 numbers at the present juncture. The State Department is continuing to process DV-2021 applications. *See Goh* Defs.' Standing Br., Decl. of Morgan Miles, ECF No. 37-2, ¶¶ 11–12. And, as of this date, there are approximately twenty days left in the 2021 fiscal year for Defendants to continue processing visas. Until the court and the parties have a better idea of how many diversity visas the State Department will process over the next few weeks, it would be premature to set aside diversity visas numbers. The court therefore orders Defendants to expeditiously process and adjudicate diversity visas prior to September 30, 2021, and will revisit the issue of reserving visas closer to the end of the 2021 fiscal year.

## V.    CONCLUSION AND ORDER

For the foregoing reasons, the court (1) grants the *Goh* Plaintiffs summary judgment on their claims that the No-Visa Policy is contrary to law and Defendants unreasonably delayed their visa applications; (2) denies the *Goh* Defendants' motion for summary judgment except as to Plaintiffs who have already received their diversity visas; (3) denies the *Filazapovich* Plaintiffs' motion for a preliminary injunction; and (4) grants the *Goodluck* Plaintiffs' motion for a preliminary injunction because they are likely to succeed on their claims that the No-Visa Policy is contrary to law, that Defendants unreasonably delayed and unlawfully withheld adjudication of their DV-2021 applications, and that Defendants' prioritization policy is arbitrary and capricious as applied to diversity visa applicants.

The court orders as follows:

(1) Defendants shall undertake good-faith efforts, directly and through their designees, to expeditiously process and adjudicate DV-2021 applications and derivative beneficiary applications by September 30, 2021.

(2) The November 2020 prioritization policy is preliminarily enjoined as to DV-2021 selectees and their derivative beneficiaries.  Defendants may not rely on the November 2020 prioritization policy to foreclose or prohibit embassy personnel, consular officers, or any administrative processing center (such as the KCC) from processing, reviewing, or adjudicating a 2021 diversity visa or derivative beneficiary application.  Some clarification is necessary.  First, the court's order does not affect the prioritization scheme as to any other visa category or in any other respect.  Second, the court's order does not prevent any embassy personnel, consular officer, or administrative processing center from

prioritizing the processing, adjudication, or issuance of visas based on resource constraints, limitations due to the COVID-19 pandemic, or country conditions. Third, the court is not directing the State Department to prioritize the DV-2021 applications of Plaintiffs over the DV-2021 applications of non-Plaintiffs. *Cf. Gomez III*, 2021 WL 3663535, at *24 (declining to prioritize named plaintiffs over class members out of "respect [for] Congress's decision that the processing of diversity visas proceed in a random order").

(3) The parties shall file a Joint Status Report on September 23, 2021, that indicates (a) by month since February 2021 with respect to DV-2021 applicants and derivative beneficiaries: (i) the number of interviews scheduled; (ii) the number of interviews conducted; and (iii) the number of visas issued; and (b) the number of interviews scheduled between September 23, 2021, and September 30, 2021.

(4) The parties shall appear via videoconference for a status hearing at 11:00 a.m. on September 27, 2021.

(5) The court will withhold entry of final judgment in *Goh* until it determines whether additional relief in the form of reserving DV-2021 numbers is appropriate.

Dated:  September 9, 2021

Amit P. Mehta
United States District Court Judge

57